IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL HYDROPOWER ASSOCIATION and NORTHWEST HYDROELECTRIC ASSOCIATION,<br><br>            Plaintiffs,<br><br>v.<br><br>U.S FISH AND WILDLIFE SERVICE; SECRETARY DEBRA HAALAND, in her official capacity as U.S. Secretary of the Interior; NATIONAL MARINE FISHERIES SERVICE; and SECRETARY GINA RAIMONDO, in her official capacity as U.S. Secretary of Commerce,<br><br>            Defendants. | Civil Action No. 1:24-cv-2285 |

## **COMPLAINT**

**I.   INTRODUCTION**

1.   Plaintiffs NATIONAL HYDROPOWER ASSOCIATION ("NHA") and NORTHWEST HYDROELECTRIC ASSOCIATION ("NWHA") (collectively, "Plaintiffs" or "Associations"), hereby bring this civil action against U.S FISH AND WILDLIFE SERVICE ("FWS"), DEBRA HAALAND, U.S. Secretary of the Interior, NATIONAL MARINE FISHERIES SERVICE ("NMFS," and with FWS, the "Services"), and GINA RAIMONDO, U.S. Secretary of Commerce (collectively, "Defendants"), for declaratory and injunctive relief from Defendants' *ultra vires* amendments to their Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"), Section 7 interagency consultation implementing regulations. *See* Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 89 Fed. Reg. 24,268 (Apr. 5, 2024) ("Section 7 Final Rule").

1

2. Section 7 of the ESA requires federal agencies to consult with the Services to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical."  16 U.S.C. § 1536(a)(2).  At the conclusion of this consultation, the Services "shall provide to the Federal agency and the applicant, if any, a written statement setting forth the [Service's] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."  *Id.* § 1536(b)(3)(A).

3. When an action may result in the take of a listed species, the Service(s) provide

> the Federal agency and the applicant concerned, if any, with a written [incidental take] statement that—(i) specifies the impact of such incidental taking on the species, specifies those reasonable and prudent measures [("RPMs")] that the [Service] considers necessary or appropriate to *minimize* such impacts, . . . and (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both. . . .

*Id.* § 1536(b)(4)(C) (emphasis added).

4. Until recently, for almost 40 years, the Services' regulations were consistent with the plain language of Section 7 and correctly limited RPMs to those that "minimize the impacts, i.e., amount or extent, of incidental take."  *See, e.g.*, 50 C.F.R. §§ 402.02 & 402.14(*i*)(1) (1986).

5. Under 50 C.F.R. §§ 402.02, 402.14(*i*)(1)-(3) as promulgated in the Section 7 Final Rule ("RPM Revisions"), the Services departed from the plain language of the ESA and their historical interpretation and practice to allow themselves to impose offsets as RPMs.  The RPM Revisions are inconsistent with the ESA and represent, without adequate justification, an abrupt departure from the Services' interpretation of the scope of RPMs authorized by the ESA.  *See*

2

Section 7 Final Rule at 24,269 (acknowledging that the rule changes the agencies' historical practice).

6. Plaintiffs seek an order: (a) declaring that, under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"), the RPM Revisions are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and were promulgated in excess of the Services' statutory jurisdiction and authority; (b) vacating and setting aside the RPM Revisions; (c) enjoining the Services from applying or enforcing the RPM Revisions; and (d) any other relief this Court deems proper.

## II. PARTIES

7. Plaintiff NHA is a nonprofit national association dedicated to promoting the growth of clean, affordable United States hydropower. NHA promotes the role of hydropower as a reliable renewable energy source that advances national environmental and energy policy objectives. NHA represents approximately 320 hydropower-industry companies in North America, including public- and investor-owned utilities and independent power producers. Its members are involved in projects throughout the United States, including both federal and nonfederal hydroelectric facilities. In fact, NHA members own and operate the majority of the nonfederal waterpower-generating facilities in the United States.

8. Plaintiff NWHA is a non-profit trade association that represents and advocates on behalf of the Northwest hydropower industry. NWHA has approximately 130 members from all segments of the industry. NWHA is dedicated to the promotion of the Northwest region's waterpower as a clean, efficient energy source while protecting the fisheries and environmental quality that characterize the region.

9. For over a century, hydropower has generated clean, affordable, and renewable energy. In 2022, hydropower generation totaled 262 terawatt-hours in the United States, represented 6.2% of total U.S. electricity generation, and accounted for 28.7% of renewable electricity. U.S. Dep't of Energy, U.S. Hydropower Market Report at 16 (2023), *available at* https://www.energy.gov/sites/default/files/2023-09/U.S.%20Hydropower%20Market%20Report%202023%20Edition.pdf. In 2022-2023, the western United States produced 60% of hydropower in the United States, with projects in Washington and Oregon alone providing 37% of the United States' total hydropower capacity. U.S. Energy Info. Admin., "Western U.S. hydropower generation fell to a 22-year low last year" (Mar. 26, 2024), https://www.energy.gov/sites/default/files/2023-09/U.S.%20Hydropower%20Market%20Report%202023%20Edition.pdf. Hydropower provides energy to over 30 million American homes. This year, the United States expects hydropower to increase in nearly every part of the country for a total increase of 6.0%, accounting for 250 billion kilowatt-hours of electricity generation. U.S. Energy Info. Admin., "U.S. hydropower generation expected to increase by 6% in 2024 following last year's lows" (Apr. 18, 2024), https://www.eia.gov/todayinenergy/detail.php?id=61883. Hydropower also enables other energy sources, such as wind and solar, greater integration into the power grid, remaining ready to produce power during periods of lower production.

10. Many of the Associations' members hold licenses issued by the Federal Energy Regulatory Commission ("FERC") to construct and operate hydropower facilities. Under the Federal Power Act ("FPA"), FERC has exclusive authority to license the nonfederal hydropower projects operated by the Associations' members. 16 U.S.C. § 797(e). The FERC licensing process is a comprehensive approval process and involves a complex web of regulatory regimes, including multiple opportunities for the Services to impose requirements related to fish and wildlife species.

Section 18 of the FPA gives the Secretaries of Commerce and the Interior the authority to prescribe such fishways as deemed necessary and FERC is required to include the prescription as a condition of any license issued.  Under Section 10(j) of the FPA, federal and state fish and wildlife agencies, including the Services, make recommendations to protect, mitigate damages to, and enhance fish and wildlife resources.  FERC is required to include conditions in the license based on these recommendations, unless it finds that they are inconsistent with Part I of the FPA or other applicable law.

11. FERC is also required to consult with the Services under Section 7 of the ESA prior to issuing a new or original license or license amendment when that action "may affect" ESA-listed species or their critical habitats.  The Associations' members account for a large percentage of the hydropower licensing proceedings currently before FERC, all of which will require compliance with ESA Section 7.

12. If incidental take will occur as a result of the action, the Services will provide an incidental take statement that includes RPMs.  RPMs must be followed in order for the federal action agency to have take coverage and avoid liability under the ESA.  Accordingly, FERC treats RPMs as mandatory conditions and incorporates them into their licenses.  Thus, the Associations' members are subject to conditions and limitations placed in incidental take statements, including RPMs, at the conclusion of FERC's Section 7 consultation(s) with the Service(s).  The Associations' members include hydropower licensees that will be adversely impacted by the RPM Revisions, because they will be required to bear the cost and burden of implementing the offsets imposed as RPMs under the RPM Revisions, in addition to the other measures and conditions imposed in the licensing process.

13. Additionally, members of the Associations are subject to the Section 7 consultation process when other federal permits, such as Clean Water Act Section 404 permits, or federal approvals, such as authorizations to use federal land, are required. The Associations' members may be adversely impacted by the RPM Revisions as they are applied in such consultations.

14. The Associations—on behalf of their members—filed comments on the proposed rule. Hydropower Industry Comments on Proposed ESA Interagency Consultation Rule Docket Number: FWS-HQ-ES-2021-0104 (Aug. 21, 2023), https://www.regulations.gov/comment/FWS-HQ-ES-2021-0104-100268. Among other things, the comments explained that the proposed RPM Revisions, adopted in pertinent part in the Section 7 Final Rule without change: (a) are inconsistent with the plain language of the ESA, which limits RPMs to those that minimize the impact of take, (b) constitute a substantial departure from the Services' and the Courts' interpretation of the ESA since its enactment, and (c) improperly delegate mitigation authority to the Services.

15. In sum, the Associations have standing to challenge the RPM Revisions.

16. Defendant Debra Haaland, U.S. Secretary of the Interior, is the highest-ranking official within the Department of the Interior and, in that capacity, has responsibility for the administration and implementation of the ESA with regard to endangered and threatened terrestrial and freshwater plant and animal species, and for compliance with all other federal laws applicable to the Department of the Interior. Secretary Haaland has delegated her authority under the ESA to Defendant FWS. Secretary Haaland is being sued in her official capacity.

17. Defendant Gina Raimondo, U.S. Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has responsibility for the administration and implementation of the ESA with regard to endangered and threatened marine and anadromous fish species, and for compliance with all other federal laws applicable to the

Department of Commerce. Secretary Raimondo has delegated her authority under the ESA to Defendant NMFS. Secretary Raimondo is being sued in her official capacity.

18. Defendant FWS is a federal agency within the Department of the Interior. FWS carries out Defendant Secretary Haaland's responsibilities with regard to creating regulations to implement the ESA, as well as enforcing the ESA.

19. Defendant NMFS is a line office within the National Oceanic and Atmospheric Administration, a federal agency within the Department of Commerce. NMFS carries out Defendant Secretary Raimondo's responsibilities with regard to creating regulations to carry out the ESA, as well as enforcing the ESA.

## III.    JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).

21. An actual controversy exists between the parties to this lawsuit under 28 U.S.C. § 2201(a).

22. Defendants' violations of law are subject to this Court's review pursuant to the APA, 5 U.S.C. § 702 et seq. Under Section 702 of the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[, or] without observance of procedure required by law." *Id*. § 706(2)(A), (C), (D).

23. The Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, and Federal Rule of Civil Procedure 57.

24. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because (a) Defendants are U.S. agencies and officers acting in their official capacities; (b) the claims do not involve real property; and (c) this is the judicial district in which Defendant FWS and Plaintiff NHA reside, and in which a substantial part of events giving rise to the claims occurred.

## IV. BACKGROUND

### A. Statutory Background

#### i. The Administrative Procedure Act

25. The APA provides persons "adversely affected or aggrieved by agency action" the right to judicial review thereof. 5 U.S.C. § 702. Review is limited to final agency action. *Id.* § 704.

26. An aggrieved party may challenge an agency action, finding, or conclusion pursuant to the APA on the grounds that it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, or in excess of the authority granted by statute. *Id.* § 706(2)(A), (C).

27. Additionally, agencies must promulgate regulations with observance of the procedure required by the APA. *Id.* § 553. The APA requires agencies to give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation, and to consider "the relevant matter presented." *Id.* An agency must consider and respond to comments as a means of demonstrating that the relevant factors were considered.

### ii. The Endangered Species Act

28. Under Section 9 of the ESA, no person subject to the jurisdiction of the United States may "take" an endangered species. 16 U.S.C. § 1538(a)(1). Section 4(d) of the ESA allows the Secretary, by regulation, to extend Section 9's take prohibition to threatened species. *Id.* § 1533(d).

29. "Take" is defined broadly to include actions that may result in harassing or harming an endangered species, as well as those that involve pursuing, hunting, shooting, wounding, killing, trapping, capturing, or collecting of listed species, and even those that involve mere "attempt[s] to engage in any such conduct." *Id.* § 1532(19).

30. Unless the Service(s) issue an incidental take statement, violation of the prohibition on "take" of a listed species may result in civil penalties and/or criminal charges. *Id.* §§ 1539(a)(1), 1540(a)–(b).

31. Under Section 7 of the ESA, all federal agencies must ensure that any action that they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* § 1536(a)(2).

32. To comply with their substantive duty to prevent jeopardizing a listed species or destroying or adversely modifying designated critical habitat, the ESA requires federal agencies undertaking the federal action (the "action agency") to engage in consultation with the Service(s). *Id.* § 1536(a)(2).

33. At the completion of formal consultation, the Service(s) issue an opinion setting forth a determination of whether the action will result in jeopardy to a listed species or in the

adverse modification or destruction of designated critical habitat ("biological opinion"). *Id.* § 1536(b)(3)(A).

34. Where the Services find that jeopardy is likely to occur, or that critical habitat is likely to be destroyed or adversely modified, the Services will identify reasonable and prudent alternatives ("RPAs") that would prevent jeopardy from occurring. *Id.* § 1536(b)(3)(A). RPAs are actions necessary to avoid a finding of jeopardy/adverse modification, and thus RPAs may include mitigation. *Id.*; *see also* FWS, Endangered Species Act Compensatory Mitigation Policy at 4 (2023), *available at* https://www.fws.gov/sites/default/files/policy/pdfs/FWS-ESA-Compensatory-Mitigation-Policy-amend_1.pdf. The federal action cannot take place unless an RPA is implemented.

35. If the Services conclude that the action will not cause jeopardy or adverse modification, or offer an RPA that they believe avoids jeopardy and adverse modification, the biological opinion will include an incidental take statement, specifying the impact of anticipated incidental take on the species. 16 U.S.C. § 1536(b)(4). An incidental take statement includes, among other requirements, RPMs that the Service(s) "consider[ ] necessary or appropriate to *minimize* such impact." *Id.* § 1536(b)(4)(ii) (emphasis added).

36. In contrast to Section 7, Section 10 of the ESA allows the Services to authorize take as a result of actions that are not associated with a federal agency action. In this context, the ESA explicitly contemplates that the applicant for take coverage will "minimize and mitigate" the impacts of the take. *Id.* § 1539(a)(2)(A)(ii), (B)(ii).

**B.     Regulatory Background**

37. Since 1986, up until May of 2024, the Services' regulations provided that the Services must "[s]pecif[y] those reasonable and prudent measures that the[y] consider[ ] necessary or appropriate to minimize such impact," 50 C.F.R. § 402.14(*i*)(1)(ii) (1986), where "such impact"

10

refers to "the impact, i.e., the amount or extent of such incidental taking on the species." *Id.* § 402.14(*i*)(1)(i).  RPMs were defined as those actions deemed "necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take." *Id.* § 402.02.

38. In 1998, to assist with the implementation of Section 7 consultation requirements, the Services developed the Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act (Mar. 1998) ("Consultation Handbook"), *available at* https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

39. The Services and their employees have followed this Consultation Handbook for the past 25 years.

40. The Consultation Handbook explicitly provides that mitigation measures (i.e., offsets) are *not* appropriate minimization measures under Section 7: "*Section 7 requires minimization of the level of take.  It is not appropriate to require mitigation for the impacts of incidental take.*" Consultation Handbook at 4-53 (emphasis in original).

41. The Consultation Handbook contrasts Section 7 permitting against Section 10 permitting, explaining that Section 10 authorizes the Services "to minimize and mitigate" adverse impacts to species, whereas under Section 7, "minimization of the level of take" is all that is contemplated.  *Id.* at 2-4 to 2-5.

V. **ALLEGATIONS**

A. **The Final Section 7 Rule is Ultra Vires**

42. On June 22, 2023, the Services issued a proposed rulemaking to amend their ESA interagency consultation regulations, including a proposed change to expand the scope of RPMs to include "offsets" of the impacts of the action's take of listed species.

11

43. The Associations filed detailed comments on the proposed rule. Among other things, the Associations explained that the proposed RPM Revisions were inconsistent with the ESA because they allow the Services to impose RPMs that go beyond minimization and require offsets for the impact of take on the species.

44. On April 5, 2024, the Services finalized their proposed changes to the Section 7 implementing regulations. The Section 7 Final Rule, including the RPM Revisions, became effective on May 6, 2024.

45. The RPM Revisions modify the definition of "reasonable and prudent measures" set forth in 50 C.F.R. § 402.02 to provide that such measures are those considered "necessary or appropriate to minimize the impact of the incidental take on species." The RPM Revisions further revise 50 C.F.R. § 402.14(*i*)(1)(i) and (ii) to reflect the same change.

46. One RPM Revision amends the regulations to provide that RPMs may include measures that "offset" the impact of incidental take:

> Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action, may involve only minor changes, and may include measures implemented inside or outside of the action area that avoid, reduce, or *offset the impact of incidental take*.

50 C.F.R. § 402.14(*i*)(2) (2024) (emphasis added).

47. Another RPM Revision adds a paragraph to 50 C.F.R. § 402.14 to emphasize that the Services can require offsets both inside and outside the project action area:

> Priority should be given to developing reasonable and prudent measures and terms and conditions that avoid or reduce the amount or extent of incidental taking anticipated to occur within the action area. To the extent it is anticipated that the action will cause incidental take that cannot feasibly be avoided or reduced in the action area, the Services may set forth additional reasonable and prudent measures and terms and conditions *that serve to minimize the impact of such taking on the species inside or outside the action area*.

*Id.* § 402.14(*i*)(3) (emphasis added).

48. The preamble to the Section 7 Final Rule recognizes "that the revisions to the regulatory provisions expanding the scope of RPMs represent a change in the Services' practice." Section 7 Final Rule at 24,269.

49. The RPM Revisions exceed the limits placed on the Services' authority under the ESA because they include offsets as part of RPMs.

50. The plain text and structure of the ESA show that Congress explicitly limited RPMs to those measures that "minimize" the impact of incidental taking on a listed species. Minimization does not include or encompass offsets of impacts.

51. Congress' choice to reference only minimization in defining the scope of RPMs imposed through the Section 7 consultation process stands in contrast to Section 10 of the ESA, which requires an applicant to both "minimize and mitigate" the impacts of incidental take. The RPM Revisions also have the effect of converting RPMs into RPAs, removing the distinction between measures that can be imposed in a jeopardy context versus a no-jeopardy context.

52. The ESA does not authorize the Services to impose offsets as a part of RPMs. The RPM Revisions are, therefore, contrary to law and exceed the Services' authority under the ESA.

**B.  The RPM Revisions Are Arbitrary and Capricious.**

53. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

54. The RPM Revisions are not reasonable and are, therefore, arbitrary and capricious. The RPM Revisions provide no standard as to the amount or scale of the offsets that the Services may require. Instead, they leave that determination to the subjective view of individual staff

13

members who will resolve the issue on an ad hoc basis. A standardless rule is a hallmark of capriciousness. A regulation that is unclear as to what is required impermissibly delegates policy matters to staff members to resolve them "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

55. The Section 7 Final Rule is internally inconsistent because it allows for RPMs to include offsets outside of the action area in contradiction of the regulatory prohibition on changes that affect the location of the project.

56. The reversal of the Services' decades-old interpretation reflected in the RPM Revisions is arbitrary and capricious because it is not reasonably explained. The Services' long held position was that mitigation measures (i.e., offsets) are *not* appropriate minimization measures under Section 7.

57. The Services' explanation of their departure from this longstanding understanding relies on a novel, unnecessary and incorrect interpretation of the ESA. The Services' new interpretation of the ESA is neither necessary nor reasonable because the ESA is clear on its face: RPMs are measures to *minimize* the impact of incidental take.

58. The Services assert that their reversal in position is warranted because it will allow the Services to address impacts of "incidental take that may not have been sufficiently minimized through measures confined to avoiding or reducing incidental take levels." Section 7 Final Rule at 24,269. This statement is unsubstantiated and, more importantly, demonstrates that the RPM Revisions are intended to go beyond the statutory minimization requirement. The Services lack the authority to create an offset requirement simply because they did not find Congress' minimization requirement to be sufficient.

59. The Services compare the definitions of minimization and mitigation in an effort to argue that Congress' use of the term "minimization" overlaps with "mitigation." *Id.* at 24,283. But the term used in the RPM Revisions is "offset." Offset has a very different meaning from minimize.

60. The Services acted arbitrarily and capriciously, and failed to follow required procedures, by failing to respond to significant comments. "[T]he duty to respond to significant comments finds a statutory basis in required notice and comment procedures, for the 'opportunity to comment is meaningless unless the agency responds to significant points raised by the public.'" *Ala. Power Co. v. Costle*, 636 F.2d 323, 384 (D.C. Cir. 1979) (citation omitted). An agency acts arbitrarily and capriciously "if it 'entirely fail[s] to consider an important aspect of the problem,'" including by failing to respond to significant factors raised in public comments. *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alteration in original).

61. The Services failed to address many of the points raised in the Associations' comments, and thus failed to consider an important aspect of the problem. For example, the Services failed to consider or respond to the Associations' comment that where Congress intended mitigation to be required for a federal action, it authorized the action agency to require such mitigation through the underlying authorizing statute. No such authorization was granted to the Services in the context of RPMs.

62. The Services failed to consider how the reversal of their longstanding interpretation impacts reliance interests of the regulated community. When an agency changes course, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must

15

be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citations omitted).

## VI. FIRST CLAIM FOR RELIEF

### Violation of the APA (5 U.S.C. § 706(2)(A), (C))

63. Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

64. A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law [or]. . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

65. "For regulations, in order to be valid must be consistent with the statute under which they are promulgated." *United States v. Larionoff*, 431 U.S. 864, 873 (1977).

66. The plain language of the ESA limits RPMs to "measures that the Secretary considers necessary or appropriate to *minimize* such impact." 16 U.S.C. § 1536(b)(4)(ii) (emphasis added).

67. The RPM Revisions, collectively, purport to authorize the Services to impose RPMs to not only minimize, but offset, the impact of take of listed species.

68. Because the RPM Revisions expand the scope of RPMs beyond the plain text of the ESA, the RPM Revisions are not in accordance with the ESA and are in excess of the Services' statutory authority.

## VII. SECOND CLAIM FOR RELIEF

### Violation of the APA (5 U.S.C. § 706(2)(A))

69. Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

70. Agency regulatory actions cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

71. The RPM Revisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 5 U.S.C. § 706(2)(A) because, among other things, they: are unlawful and inconsistent with the ESA; represent a reversal of the Services' prior regulations and interpretation in the Consultation Handbook without reasonable explanation; are internally inconsistent with other provisions of the Section 7 Final Rule; provide no standard as to the amount or scale of the offsets that the Services' may require; and fail to consider the Associations' comments and reliance interests.

## VIII.   THIRD CLAIM FOR RELIEF

### Violation of the APA (5 U.S.C. §§ 553, 706(2)(D))

72. Plaintiffs incorporate by reference, as if fully set forth here, each and every allegation set forth in the preceding paragraphs.

73. The APA provides that an agency must give notice of a proposed rule, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," consider the "relevant material presented," and "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). The agency's "duty to respond to significant comments finds a statutory basis in required notice and comment procedures, for 'the opportunity to comment is meaningless unless the agency responds to significant points raised by the public.'" *Ala. Power Co. v. Costle*, 636 F.2d at 384.

74. The Section 7 Final Rule was promulgated "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(D) because, among other things, the Section 7 Final Rule fails to consider and respond to significant points in the Associations' comments.

## IX. PRAYER FOR RELIEF

WHEREFORE, the Associations respectfully request that the Court:

(1) Declare that the Services' provisions relating to RPMs in 50 C.F.R. § 402.14(*i*)(2)–(3) are not in accordance with the ESA and exceed the Services' statutory authority;

(2) Declare that the Services acted arbitrarily, capriciously, and contrary to the ESA, in violation of the APA, 5 U.S.C. § 706(2)(A), in promulgating the RPM Revisions;

(3) Hold unlawful and set aside the RPM Revisions in 50 C.F.R. § 402.14(*i*)(2)-(3);

(4) Enjoin the Services from applying or otherwise relying on the RPM Revisions in 50 C.F.R. § 402.14(*i*)(2)-(3);

(5) Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

(6) Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Dated this 2nd day of August, 2024.

VAN NESS FELDMAN, LLP

/s/ *Jenna Mandell-Rice*

| | |
|---|---|
| Tyson C. Kade, DC Bar No. 1018014 | Jenna Mandell-Rice, DC Bar No. 1021549 |
| 2000 Pennsylvania Avenue, NW | Tiffanie A. Ellis, *pro hac vice pending* |
| Suite 6000 | 1191 Second Avenue, Suite 1800 |
| Washington, DC 20006 | Seattle, WA 98101 |
| Tel.: 202.298.1800 | Tel.: 206.623.9372 |
| Email: tck@vnf.com | Email: jrm@vnf.com |
| | tellis@vnf.com |

*Counsel for National Hydropower Association*

TROUTMAN PEPPER HAMILTON
SANDERS LLP

Andrea Wortzel, *pro hac vice renewal pending*
1001 Haxall Point
Richmond, VA 23219
Tel: 804.697.1406
Email: andrea.wortzel@troutman.com

*Counsel for Northwest Hydroelectric Association*
